ESTATE OF J. S. A. SPICER, ROBERT L. SPICER, ADMINISTRATOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Spicer v. Commissioner
Docket No. 2955-72.
United States Tax Court
T.C. Memo 1974-13; 1974 Tax Ct. Memo LEXIS 307; 33 T.C.M. (CCH) 45; T.C.M. (RIA) 74013; January 22, 1974, Filed. *307 Value of decedent's interest in a 2,595.51-acre ranch near Kerrville, in Kerr County, Tex., determined. Robert H. Spicer, for the petitioner.
Leslie Platner, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION
DRENNEN, Judge: Respondent determined a deficiency in the Federal estate tax due from the Estate of J. S. A. Spicer in the amount of $68,498.67. The only issue before the Court is the value of decedent's interest in property known as the Spicer ranch at the date of decedent's death. 2 FINDINGS OF FACT
Some facts have been stipulated and are so found.
Petitioner, Robert L. Spicer, was administrator of the estate of J. S. A. Spicer at the time the petition herein was filed and at the time of the *308 trial. [1] Robert L. Spicer was a resident of Kerrville, Tex., when the petition was filed. A Federal estate tax return was filed for the estate of J. S. A. Spicer with the district director of internal revenue at Austin, Tex., on December 13, 1968. J. S. A. Spicer died in Kerrville, Tex., on June 28, 1968.
At the time of his death, J. S. A. Spicer owned a substantial interest in the Spicer ranch which consisted of 2,595.51 acres located in Kerr County, Tex. Decedent owned 603.10 acres of an undivided and unpartitioned 1,537 acres of the ranch and owned another 1,058.51 acres outright.
The Spicer ranch is 7.5 miles southwest of Kerrville, which is 65 miles northwest of San Antonio and 105 miles west of Austin, all in Texas. The ranch is accessible by three local two-lane, asphalt-paved highways. State Highway 16, the major road in the area, divides the ranch on 3 its way from Kerrville to San Antonio. The ranch has about 6,336 feet of frontage on the north side of Highway 16 and about 3,696 feet *309 of frontage on the south side of Highway 16. The ranch borders on County Road 1273 and on Farm Road 2771, with about 4,224 feet of frontage on the southwest side of Farm Road 2771 and about 7,392 feet of frontage on the northwest side of County Road 1273. The land in and around the ranch features scenic, rugged hills and valleys and several creeks and rivers. The area has several game ranches and good native hunting and fishing as well.
State Highway 16 divides the ranch into a northern section and a smaller southern section. The northern portion is covered with heavy brush, cedar, live oaks, and, in parts, shim oaks. Some draws are clear of heavy brush. There are numerous rocky outcroppings, and some of the northern portion was, at the time of decedent's death, accessible only by four-wheel-drive vehicle or truck. A bluff runs east to west and there is a plateau, covered with light brush and cedar, of about 150 acres. A seasonal unnamed creek runs north to south on the eastern side, and a permanent watercourse named Turtle Creek bisects the northwest corner, with about 900 feet of frontage on both sides. The southern portion is also bisected by Turtle Creek, with about 3,700 *310 feet of frontage on the north side of the creek and about 3,400 feet on the south side.The area north of Turtle 4 Creek and south of State Highway 16 is gently rolling with light brush, cedar, live oaks, some shim oaks, and native grasses. Coal Oil Creek, which is seasonal, also runs through this part of the property. South of Turtle Creek, the land becomes progressively steeper, and a mountain is located at the extreme southern portion. Access to this area, which has never been cleared and features heavy brush and cedar, is only by heavy vehicle or horseback. There is no bridge across Turtle Creek, and in times of heavy rain access is impossible. Turtle Creek is meandering and scenic in this area. Turtle Creek is not damned on the ranch; an attempt to dam the creek before the decedent's death ended in failure, as the dam washed out.
Improvements on the ranch at the time of J. S. A. Spicer's death were a main frame construction, 7-room, single-family residence built in 1894, a small frame, single-family residence approximately 70 years old, a frame garage, corrals and a holding pen, two barns, a water well, and boundary fencing. The improvements tended to be in poor condition. *311 The highest and best use of the Spicer ranch at the time of decedent's death was for recreational purposes. [2] Sometime 5 prior to decedent's death, development of property in the Kerrville area for residential and recreational purposes had commenced with people from the larger cities to the east buying land. During the period surrounding the time of death of J. S. A. Spicer, the rate of annual increase in sales price and value of property in Kerr County was approximately 15 percent.
Petitioner reported the value of decedent's interest in the Spicer ranch as a total of $111,327.87 on the estate tax return filed for the estate. The date of death of decedent, June 28, 1968, was used as the valuation date and that date will hereinafter be referred to as the "critical date." The gross estate reported was valued at $184,085.43, deductions claimed totaled $18,003.40, leaving an adjusted gross estate of $166,082.03. In his notice of deficiency respondent determined that the fair market value of decedent's interest in the Spicer ranch *312 was $332,322.
ULTIMATE FINDING OF FACT
The fair market value of decedent's interest in the Spicer ranch at the time of his death was $210,000. 6 OPINION
The only issue before us is to determine the fair market value of decedent's interest in the Spicer ranch on the date of his death. Our ultimate finding of fact disposes of that issue.
Section 2031(a), I.R.C. 1954, provides that:
The value of the gross estate of the decedent shall be determined by including * * * the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated.
Section 20.2031-1(b), Estate Tax Regs., provides that:
fair market value is the price at which * * * property would exchange hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.
The evidence presented in this case consisted of the testimony and appraisal report of petitioner's expert witness, R. Floyd Price, the testimony and appraisal report of respondent's expert witness, Albert Scruggs Love, Jr., and rebuttal testimony by petitioner, Robert L. Spicer.
Petitioner's expert, R. Floyd Price, has *313 had a real estate sales and appraisal business in Kerrville since 1956. He also owns the Kerr County Lumber Co., which is run by a manager. The record indicates that his formal education in real estate appraisal is limited to several courses given by the American Institute of Real Estate Appraisers; he has never been a teacher of real estate appraisal. Price has held office in several real estate organizations in Texas, 7 is a member of the American Society of Appraisers, but is not a member of the American Institute of Real Estate Appraisers. Price is very familiar with the real estate market in Kerr County and has been personally acquainted with nearly every sale of ranch land there since 1963 or 1964. Price made two appraisals of the Spicer ranch. The first was performed about 2 months after decedent's death, and his appraisal report found the value of the raw land to be $75 per acre, or a total of $192,097 for the entire 2,561.3 acres in the Spicer ranch, to which was added $3,151 as the value of the improvements, making a total value rounded out to $195,000 for the entire ranch. Price's second appraisal was made during the week prior to trial, and his second appraisal report, *314 which was introduced in evidence by petitioner, found the value of the raw land to be $85 per acre, or a total of $217,710 for the entire 2,561.3 acres in the Spicer ranch, to which was added the same value for the improvements as related above. Neither of Price's appraisal reports reflected a specific value for decedent's interest in 1,661.61 acres in the Spicer ranch. Price testified that the second appraisal report had been prepared with trial of this case in mind, and that material which had not appeared in the first appraisal report had been added to the second to "back up" petitioner's position. On cross-examination Price agreed that he had used the wrong time interval between the critical date and the date 8 of sale of two comparable properties used in his calculations.
Respondent's expert, Albert Scruggs Love, Jr., has maintained his real estate appraisal practice in San Antonio, Tex., since 1964. He has been in practice since 1960. He has no other business. Love obtained a degree from the Graduate School of Commerce, University of Texas, majoring in real estate, has taken a variety of courses in real estate appraisal, and has also taught such courses. Love is a *315 member of the American Institute of Real Estate Appraisers and of the American Society of Appraisers. He has been an officer of several professional appraisal associations. Love's practice has included appraisals of all types of real estate in his trade area, which includes south Texas, including the San Antonio area, the Corpus Christi area, and the lower Rio Grande Valley of Texas. Love has appraised only one other property in Kerr County: A tract of one or two acres, in 1968 or 1969. His familiarity, so far as pertinent to this case, has been with appraisal techniques generally, and not with Kerr County in particular. Love did personally inspect every comparable sale he relied on, however, and inspected the Spicer ranch three times during the course of his appraisal which took place during the latter part of 1972. Love testified that he feels qualified to appraise property anyplace in the United States, Kerr County included. Love concluded in his appraisal 9 report that the value of the Spicer ranch containing 2,595.51 acres, including land and improvements, was $171.70 per acre. His report also concluded that the value of decedent's interest in the ranch, being a total *316 of 1,661.61 acres, including land and improvements, was $171.80 per acre or a total of $285,470. Love's appraisal report stated that the largest existing industry in the Kerrville area was Mooney Aircraft which employed approximately 1,000 people. It was brought out in cross-examination of Love that Mooney Aircraft had gone bankrupt 3 or 4 years earlier.
Both appraisers used the same approach in appraising the Spicer ranch, which was referred to as a market data approach. Neither appraiser used the income method because farming, for which the Spicer ranch presumably had been used was not considered to be the highest and best use of the property. The market data approach involves the use of sales of comparable property, located in the same general area as subject property, which took place within a reasonable time prior or subsequent to the date of death or critical date for appraising the value of the Spicer property. The value of the improvements on the comparable sale was first estimated and the sales price was reduced by that amount to give the assumed sales price of the raw land in the comparable sale. That price was then adjusted up or down for each of four factors, where *317 appropriate, to correct for differences between the property being 10 appraised and the property sold and to eliminate from the value of the raw land the effect that each of those factors presumably had on the assumed price paid for the raw land in the comparable sale. The four factors used by both appraisers were the relative physical characteristics (terrain, waterflow, etc.), size, and location (proximity to Kerrville, highways, etc.) of the comparable and subject properties, and the time elapsed between the date of sale of the comparable property and the critical date. This process produced the estimated adjusted value of the raw land involved in the comparable sale. The acreage in the subject property was then multiplied by the value per acre so determined to estimate the total value of the raw land in the subject property and decedent's interest therein. [3] To this was added the appraiser's value of the improvements on subject property to arrive at the total estimated value of decedent's interest in subject property as determined from this one comparable sale.
*318 11 The above approach was taken with respect to each of the comparable sales used by the appraisers. Both appraisers used eight comparable sales, five of which were the same sales. Each appraiser used three other sales that the other appraiser had not used. Based on the suggested values derived from the eight comparable sales used, each appraiser then formed his opinion of the fair market value of subject property on the critical date.
Although both appraisers considered the same four adjustments in an effort to correct for the differences in the raw land of the comparable sale and the raw land in subject property, each used his own judgment to determine the weight to be given to each factor - and this caused the rather wide discrepancy in their opinions as to the value of decedent's interest in subject property on the critical date. With respect to the adjustment for time elapsed between the date of sale of the comparable property and the critical date, respondent's expert, Love, found four properties in the area that had been sold and resold within a reasonable time surrounding the date of death. From these sales he concluded that the value of property in the area had increased *319 about 15 percent per annum. He used this rate of increase in adjusting the value of the raw land for time if the comparable sale occurred prior to the critical date. However, if the comparable sale occurred subsequent to the critical date, 12 so the adjustment to the comparable sales price had to be downward, the mathematics of using the annual increase in value determined from the four resales to adjust the sales price of the raw land in the subsequent comparable sale back to the critical date resulted in a regression rate of 12-1/2 percent to 13 percent per annum, which Love used in his calculations. Petitioner's appraiser, Price, did not try to determine the increase in value due to time from resales of property, but based his adjustments for time on his general knowledge of sales of real estate in the Kerrville area during the period before and after the critical date. His best estimate of the rates to be used coincided with Love's, i.e., 15 percent increase if the comparable sale occurred prior to the critical date, and 12-1/2 percent to 13 percent if the comparable sale occurred after the critical date. Thus both appraisers actually used the same percentage adjustments *320 for the time factor, although Price tended to make no adjustment for time if the time elapsed was 6 months or less, while Love adjusted for time on a monthly basis. [4]
*321 13 The evidence presented in this case produces a classic example of why the valuation of property is not an exact science. Both appraisers appeared to be qualified to give expert opinions on the value of this property but, although both used the same appraisal approach and many of the same comparable sales, their opinions on value were miles apart. We are now called upon to determine the value based on the testimony and appraisal reports of these two experts although we have never even seen the land.We have done the best we can with the material available and our "guesstimate" is reflected in our ultimate finding of fact.
It would serve no useful purpose to relate in detail the processes we went through in arriving at our conclusion 14 as to value. While respondent's determination of value carries a presumption of correctness, we believe petitioner has introduced sufficient evidence to overcome that presumption, and we must decide the value from the evidence before us. In fact, respondent's own expert found a value considerably less than respondent's determination in his notice of deficiency; likewise, petitioner's expert found a value in excess of that reported on *322 the estate tax return. Suffice it to say that we have made an effort to go through the same steps taken by the two experts, relying on our "experience with the mainsprings of human conduct" [5] and our best judgment as to the qualifications of the experts in certain areas to determine the proper adjustment to be made for each of the four factors used by the experts in adjusting comparable sales to arrive at a value of the raw land in the Spicer ranch.
In doing this, because we found Love to be better qualified technically as an appraiser but found that Price had much better knowledge of the real estate in the area, we tended to lean more towards Love's conclusions with respect to the value of improvements and the effect of time, while giving more weight to Price's conclusions with respect to adjustments that should be 15 made for size, physical characteristics, and location (factors peculiar to Kerr County) of the various properties. We have made allowance for the two errors made by Price in his adjustments for the time factor involved in two of the comparable sales. We have also taken into consideration the *323 fact that while the highest and best use of this property is for residential and recreational purposes, and there has been some development along these lines in the Kerrville area, not much of it had started in the immediate area of the Spicer ranch at the time of decedent's death. Furthermore, the physical characteristics of the Spicer ranch would not dictate that it would be one of the earliest properties to be sought after for that use. In this regard, we think we comprehend the underlying theory of Spicer's testimony that in graphing out the price paid for property in a sale and later resale to try to determine the increase in value due to time, the line drawn between the two points in time is not necessarily a straight line; in other words, values may not rise uniformly throughout the time period.
We do not claim to be clairvoyant, nor do we claim that the value we have found is necessarily accurate. However, it is the best we can do with the material we have to work with. We doubt that either party will be completely satisfied 16 with our conclusion, but possibly that will indicate that the value we have determined is a good one to be used for this purpose.
Decision *324 will be entered under Rule 155. Footnotes
1. The Court is informed that Robert L. Spicer died subsequent to the trial of this case. We are not advised whether a successor administrator of the estate has been appointed.↩
2. No evidence was presented regarding the use of the Spicer ranch, the income it produced, or who lived on it at the time of decedent's death.↩
3. Price testified that he was unaware that a part of decedent's interest in the Spicer ranch was owned outright by decedent, and he gave no weight to that factor in his appraisal. Love testified that his appraisal was made on the assumption that decedent had a fee simple interest in all the 1,661.61 acres. It was agreed by the parties at trial that no weight should be given to the fact that a part of decedent's interest in the property was an undivided interest and part was an outright interest and that the value thereof should be determined as if decedent owned outright approximately 1,661.61 acres in the 2,595.51-acre Spicer ranch. We have made that assumption in reaching our conclusion herein. ↩
4. The only witness produced by either party other than the two expert appraisers, was petitioner, Robert L. Spicer. His testimony was aimed solely at discrediting Love's appraisal by attempting to show by mathematical theories and equations that Love's rate of regression was erroneous, that application of an equal annual rate of regression for time was incorrect. This Judge is not enough of a mathematician to know whether Spicer's theories were right or wrong. Spicer appeared to be well qualified as a mathematician, but he had no experience as a real estate appraiser. In fact he made no effort to show what effect this supposed error in Love's calculation would have on Love's appraisal value of the Spicer property and the Court has no way of knowing whether the theories espoused by the witnesses would be applicable in real estate appraisals. We do feel safe in saying that because of their complexities, such formulas are probably not used by real estate appraisers in valuing land or by the parties in agreeing on a sales price for land. Furthermore, if Spicer's testimony discredited Love's appraisal, it likewise discredited Price's appraisal, because they both used the same regression percentage, and we would be left with no accredited evidence of the value of the Spicer property. We have, therefore, given no weight to Spicer's testimony.↩
5. Commissioner v. Duberstein, 363 U.S. 278, 289↩.